May I please the Court, I would like to reserve five minutes for appeal. Crown's appeal presents a very narrow issue under the doctrine of equivalence relating to one limitation, one claim, of one patent. There's no dispute that the application of the doctrine of equivalence and the Graver-Tang function-way result test presents an issue of fact, is an issue of fact. The District Court granted summary judgment in this case that the accused product could not infringe the reinforcing being limitation of that one claim under the doctrine of equivalence because the function prong of the Graver-Tang test was supposedly not satisfying. This Court in Toro case held that when applying the function prong of the Graver-Tang test that not every function mentioned in the past testification was necessarily relevant or central to the application of the doctrine of equivalence. I don't think Rexam disputes in this Court's cases hold that the determination of which functions are central or important to the application of the doctrine of equivalence is also a question of fact. The District Court in this case, in the face of conflicting evidence regarding the functions, ruled that there were three relevant functions and that Crown had failed to present evidence with regard to two of those functions. We submit that there was conflicting evidence on that point because Crown's expert, Martin Hyam, had filed an expert report in which he identified what he believed to be a relevant function, which was of the reinforcing being, which was to provide strength to the cannon. But basically he's saying it's not a subject where there's an issue of fact that needs to be tried. That's right. And that's the argument we make below. It's the fundamental argument that we make here, and that is that Mr. Hyam's expert report, where he pointed to a single function and attempted to show why that function was satisfied in the accused product, should have precluded assembly judgment. But would that happen every time that there are dueling expert reports at assembly judgment? No assembly judgment could be issued because there's a difference of opinion at that point? Well, I think on the question of the function way result test, the way it's typically carried out from my experience is that the experts address the subjects, and in many cases that is the evidence. I suppose if an expert report didn't address all the questions and the questions were factual and material to the issue and dispute it, that might be... Counsel, maybe I'm cutting off prematurely, but I thought your answer to Judge Baer's might have been in this case there were no dueling experts. Both your expert and their expert said this was the one and only function, and it was only a manufacturer attorney argument that is supposedly... That is the case in this case. I'm going to cut you off right here. I'm sorry. No, no. Three weeks before Braxton's motion was filed, their expert, and I'm going to quote from his expert report. He said, Mr. Hyam says that the function of the conventional anti-peaking bead is to increase the pressure resistance of a C-non-canon. And then skipping a little, he said, I agree that one of ordinary skill in the art of canon design, and our manufacturer view that as the function of the bead. That's in appendix 3077. So going into the... It's hard to say there's no dispute of fact when both experts actually think this is the What happened here is that when the summary judgment motion was filed three weeks later, Rexham put into their opening brief in the argument section, the attorneys pointed to sections in the patent specification that they believe created additional functions. But if you looked at the statement of facts in their brief, they nowhere said that those And so... I thought that was the thrust of their argument about why it was pertinent that there were three functions. Well, if you actually... I think it's very instructive to look at the statement of facts in the three briefs that the district court had in front of it when it decided the motion. Their motion started with a statement of facts that never addressed these functions. And they never said... They do address it in their legal argument, but their burden on summary judgment on this issue was to show that there was no evidence, that Crown had no evidence on an essential element of Crown's case. But under Silatex, all they have to do, since they're the moving party without the burden of proof and you're the party with the burden of proof, all they have to do is to point out, I think that's the language of the Supreme Court, to the trial court the absence of evidence of some element that you're required to prove. At which point, the burden shifts to you to introduce evidence, point to evidence that is to the contrary. The question... This is why the waiver issue is pertinent in this case. The question is, did you acquit your responsibilities under Silatex to point out to the district court three functions, two of which were not before? Well, we did... This is also a preliminary point. We did carry out our responsibilities because in our responsive brief, we pointed to the district court in four different locations to Mr. Himes' expert report in which he said the function of the reinforcing deed was to strengthen... But you didn't flesh out that there's only one function and here's the evidence. That's what struck me peculiar. There wasn't any fleshing out. If I were the district court and the magistrate judge in this case, I would have been a little frustrated with not having this laid out for me. But that's the kind of specificity that you've laid it out for us. Your Honor, I think there's a reason why the district court might have been frustrated and it had to do with two aspects of this case. The procedural posture at the time of the motion and the way the briefing went in. First of all, at the time of Rexham's motion, the court had not yet issued its Markman ruling. And so there was a great deal going on in the briefs because each of the parties were arguing with regard to two paths at that time and various limitations of the claims under both parties' constructions. So there's a lot in the brief, there's a lot packed in. But secondly, if you go back and you look at the briefing and in particular the statement of facts, what you'll see is that Rexham's opening statement of facts, the facts essential to its motion, never said that Crown lacked evidence on these two functions which it said were important. That was back in the argument section. In Crown's response to the brief, it pointed out in the statement of facts that it specifically directed the court to the Chaim expert report. And the brief said, Chaim's expert report precludes summary judgment on the doctrine of equivalence. And it pointed to the relevant passages in his report. It wasn't until Rexham's reply brief that Rexham for the first time said, those two are central or important and Crown has no evidence. So the actual statement that should have put us on notice didn't really come until the reply. And that's how we got into this situation in which we find ourselves. Now, if we actually look at the specification passages to which Rexham points as supposedly central functions of this feature, what you find is that the specification really doesn't support either as a central function, which is the language of Torah. The first function that they point to is the function of supposedly providing an opening in the canon in which the seaming chuck can fit. The way this works is the canon sits there and the chuck comes down, turns, and causes  Now, if you look at figure five through seven of the patent, which is mainly one embodiment, the chuck doesn't enter into the reinforcing bead in that particular embodiment. So it can't be central to this invention that the bead has to provide an opening for entry of the chuck. The chuck, when in one embodiment, it doesn't require any entry. It's clear from the specification. And if you look at column four, lines 59 and 62 of the patent, it says that the chuck of the invention is, quote, designed to drive initially on the relatively large chuck bolt without entering deeply into the anti-peaking bead, which is another term for the reinforcing bead. Now, Rexham and the district court found that that passage meant that the chuck had to enter the bead to some extent. But it's equally true that a chuck that doesn't enter the bead at all, as shown in figure five through seven, doesn't enter deeply in the bead. It's like saying, I don't like winter very much. That could mean, I like winter, but not very much. Or it could mean, and probably more likely means, I don't like winter. And so the district court and Rexham, I believe, misread that passage. I suppose one could say that, I could say, Mr. Heist didn't argue unduly long, for an unduly long period of time. I think the clear implication would be that you did argue for a while. There is an implication. It's possible to take that implication, but not if you read that passage in conjunction with figures five through seven, which show no entry whatever into the chuck. There's no way you can take the chuck in figures five through seven and move it into a position where it enters the bead. It can't be done. The other function that they pointed to, which was supporting the central panel, there's nothing in the patent specification to suggest that that's central or important, unlike the Toro case, where the element at issue was pointed to as advantageous in the patent specification. And the court still found that it wasn't a function that needed to be satisfied under the doctrinal equivalence test. But even if we assume that supporting the central panel is central or important to this invention, it's almost beyond dispute that the fold in the Rexham Act does, in fact, support the central panel. If it didn't support the central panel, the central panel would fall into the beverage when the can was filled. Our expert, Mr. Hyam, looked at, in his expert report, he indicated that the fold surrounded the perimeter of the central panel, and he did a finite element analysis to show that it provided rigidity to the central panel. Now, there's no way that the fold... But these arguments, all of these arguments you're making right now, you didn't make below. We did not make these arguments below. If you were on notice in their primary brief when they said there were two additional functions, if you were going to argue that, wait, there is a question of fact about one of those additional functions and whether it's performed by the accused device, don't you think you had an obligation to actually raise that before the district court? If we had known in their opening brief that they believed that that was a central function of the... They said there were three functions, and you keep using this word central function, and you actually said a minute ago, just so we're clear, that that's the language from Toro. The word central function, I cannot find anywhere. I do not find those two words together anywhere. Now, there might be. Maybe I'm completely overlooking them somehow, but I don't find them. Maybe it's not central function. I believe there is a word... They talk about an insignificant function, but that doesn't mean there's one central function, and that's the only one we ever focus on when assigning or looking to the doctrine of equivalence. I think that's an important distinction because it's an inaccurate characterization of the law. I didn't mean to be inaccurate. I would agree that there could be more than one function that's relevant to the doctrine of equivalence, but both parties seem to agree that there was one relevant function in this case. Both experts agree. So at the time of the briefing... Apparently they put me on notice. They thought there were two others, though, and you didn't address them, and I understand your point, but we did point to our expert report, which your argument is says one and only one, and I understand how you are arguing that and what it says, but these other two, the responses you're giving me now with regard to the other two, how do I not conclude that was waived? They clearly told you, we think there are three. They don't have to say, we think there are three and they're central, because guess what? Our case law never used that word, and so for you to say we're not waived from arguing on appeal over the other two, which you never responded to, is troubling to me. If that's not waived, I'm not sure when it doesn't. Well, as I understand the Warner-Jenkinson case, I forgot Warner-Jenkinson, the Warner-Lander case, if one argues the general issue below, which we did here, our argument below is the precise issue we're making here. That is that Mr. Payam's expert report and declaration include summary judgment. No, your argument below with regard to these facts was, as I understand it, there's one and only one function. That's how you want us to interpret your responses, but you never made any allegations with regard to a disputed issue of fact being created by whether their can does or does not present itself as a structure, and that is a very, seems to me, straightforward factual argument that I just don't find anywhere below. Your Honor is correct in that, at least with regard to the two functions in the patent specification that they raised on, they mentioned them in the argument section of their opening brief, but they didn't suggest that they were functions that required, that needed to be addressed in order to, for us to satisfy our burden of proof until a reply brief. What would be the other point of saying there are three functions that you don't perform? I mean, when they say there are three functions that you don't, and they don't perform all three, what else could they be suggesting? What they should have said in their statement of facts under Celotax was there are, Crown has no evidence with regard to these three functions. Had they said that in their brief, clearly in their opening brief, we most likely would have responded in our responsive brief. What we did in our responsive brief was to say there is one function, which is our position here. That's the position we advance below, and it's the position we advance here. You happen to have, readily, the citation that was placed in their opening brief where they make the argument about the three functions. I have it, and I can see that I'm in my remote. I'll bring it up in my response. Thank you. We'll preserve your time. Forgive me, Your Honor. It's on Joint Appendix 2134. 2134. It begins there. It's probably useful. In the opening to that page where it says the citation is referred to. All right. Well, why don't we hear from you, then, Mr. Celotax. Thank you, Your Honor. Good afternoon, Your Honor. I take it that I can make just one statement because there is a cross appeal on the marking. Can I dispose of that in a short paragraph? Sure. Your Honors are learned judges. I commit you to read Hansen. I don't care if Hansen... There would be very little policy consideration that was met by going in the direction of what Hansen does. And I understand your argument is that's dicta, or even if it's not dicta, we're bound by the earliest pronouncement on this. And American medical is distinguishable. I understand all of your legal arguments, but from a policy standpoint, tell me why in the world it makes sense. You can tell me my job is not to think policy, and I'll be okay with that, but I really want to know. You're a learned practitioner from a policy standpoint. Why does it make sense to tell people that you don't have to mark your apparatus? Eh, just in a certain method claims. Because the notice function gives the patentee a benefit. They haven't put anyone on notice. What is the policy behind why the Hansen rule ought to prevail? Well, first of all, it was starry decisiveness. American medical did not deal with those facts. All right, I will. Let's assume American medical stands for the proposition that you've got to market. What you do is cripple the patent system. Because what you then do, instead of putting both of your process or method claims and your product claims in the same patent, you file two patents. Very often the patent office will say, separate these into two patents. And then you'll have one patent that only covers methods and one patent that only covers products. If that were the case, you clearly wouldn't have to see your method patent number on top of an apparatus. That's right. But that's not the case here. So you have a single patent that covers both. And that was what was in Hansen. And we're entitled to follow Hansen until there is non-banking. Again, let's just talk about the policy. Let's assume that we had a free choice between Hansen and American medical. You were beginning to go down the road of why we should follow Hansen and not American medical. You started by saying cripple the patent system. If you're going to change the law and cripple somebody that relied on Hansen, that's one thing. But if you're going to go to American medical, which doesn't rule as a matter of law, just as a dictum, because that wasn't the issue before them. The only thing before them was, I think it was just the process claims, I believe, if I'm stating correctly. But I don't think marking was necessary there. The point is, if you are going to cripple the people that relied on Hansen and put their product claims. Assuming Hansen is not there. We're saying, imagine this is a case of first impression. I can't see any policy that supports creating a rule of law that you want. Well, the policy is, I just said it. You'll double the burden on the patent office with the number of patents. Why would I advise a client to file a patent application with both process or method claims and product claims? This marking is not an easy thing. As you see in this case, you have to follow the manufacturer. You don't know if the manufacturer really is going to sell a product that infringes. Because the tooling is different. The product that we made for ourselves never went outside our offices. No one was injured by it. We made a few machines for our own use. Kept in secret confines within the factory. What you're going to do... I understand it's hard, but don't you want to encourage marking? I mean, isn't it really valuable for the competitive world to be on notice of the existence of the patent rights? My answer still is no. Because you'll double the number of patents. Very many patents have both product and process. But the PTO gets fees for both of them. If your clients want to pay for two separate ones, hey, more power to you. From a policy standpoint, I don't see how you can say it's bad policy to ask people to mark. Your Honor, I'm not certain the patent office would agree with you at all. Doubling the patent load, that's what they get paid for. You're assuming that there's a method and an apparatus claim in every patent. That's not the case. That's the rare patent that has the two of them together today for restriction reasons, just as you mentioned earlier. This is not a case in which we'd be doubling the load of the patent office by any stretch. Nor is it a case where everyone would elect to file two separate patent sets, you're suggesting. Many people would either mark or cross that bridge, and they come to it by giving notice. Well, as I have said, the marking thing is not just simply walking up and stamping something. In this particular case, we didn't manufacture what the manufacturer did. The manufacturer said if they marked, it would be a violation of the antitrust laws because the product they were selling had many non-infringing uses. I think that's in our brief. There are all sorts of reasons for it, and I'd like to think that's the reason the five judges— that really goes back to when this court was in its beginnings. I don't think that was a non-bank hearing. I think it was everyone getting experience with patent cases. Ordinarily, you don't have five judges sitting. I was intrigued by that. But I think that was the wisdom of what they did, and I think they said it is a narrow ruling precisely because it was saying if the product is being sold, you mark it. If you're not selling the product, you don't have to mark it. If you're not suing on the product claims, you don't have to mark it. That was the narrow issue. They certainly weren't narrow just saying it had to come up through the Sixth Circuit. Read that opinion. I started out saying I'd get one paragraph. My one paragraph is that Hansen case is well-reasoned. It was by five judges. It's been relied on by patent attorneys all over the country, and the follow-up cases have no bearing at all until there's a non-bank hearing. That's my argument, and all I ask you to do is consider the ramifications of changing that law. Now, on the doctrine of equivalence, can I ask you, what if we disagree that the argument of whether there ought to be one or three functions was in fact waived? What if we view the response of Mr. Heiss's firm as sufficient to clearly be raising the issue by pointing to their expert and your expert, both of which talk about the function of this particular and your opinion? That's interesting, Your Honor. What if we were to say that we think that was sufficiently raised so that it's not waived? Because I understand your wayward argument. Now, if that's the case, why doesn't it create a question of fact as to whether there is in fact one versus three functions that need to be met by an appeal? Your Honor, during the course of this proceeding down before Judge Stein, we told her that KSR had issued it. We filed supplemental briefs. KSR is a strange case. It was based on summary judgment, and it was—they didn't remand it. The Supreme Court didn't remand it for a factual finding. I'm confused. Why are you talking about KSR? That's an obvious miscase. And I'm telling you, the same principles apply here. Your Honor, these things are—frankly, if you go to the drawings on page 7 of our brief, on page 8 of our brief, I'm going to exaggerate just a little. But what their argument is, is that a giraffe is a mouse because they both have a nose and a tail. And I'll show you why. Here, if you will look at ours, ours on page 7, it comes out to the very side and then goes behind the wall. Okay? Next time you pick up a soft drink, even here in the building, look down at a deep-seated channel and think of cleanliness. Think of cleanliness. I don't understand what this has to do with the function of this case. It has to do with why this is not even similar to what they did. You're not arguing the way, but that is not the basis of the district court's holding with regard to summary judgment. We're here to consider whether there is a disputed issue of fact with regard to DOE, and the only holding below was function. And we quoted from the patent specification very, very carefully on each of the three functions. And that's evidence. It's a government document issued with a seal. Under any rule of evidence, the patent is evidence. I'm not arguing with you that there's evidence. Suppose we agree with you. Yes, you presented evidence. But some say they had not only their expert report but your expert report. This isn't a case where we're considering giving them summary judgment. That's not what's on appeal. So it's kind of irrelevant whether you presented evidence. What's relevant is did they present something that creates a disputed fact over what you're alleging. And I guess what I'm going to say again, if I may, what KSR has done to everyone in the patent bar is said judges have common sense. And if you look at what she ruled as the Markman ruling, you have what has always gone down. And if you will look on page 13 of our brief, you will see that the Japanese application had everything but the U-shaped channel that she said was required. You see figure 7? Are you in the patent or in your figure? No, I'm figure. Figure 4. 13, figure 4 in the center of the page, Your Honor, here. That shows the hook at the top, the 45 degree angle coming down, and a channel. I'm also mentioning again the cleanliness. All they added was the old channel to the Japanese figure. The Japanese application is prior art. All right? Now, when you focus in on what they did, and then you look at the judge's Markman decision as to the necessity for that U-shaped channel, and then you look at our fold and you read Gilleste's affidavit, and they even admit that he may have confused way and function, the fact of the matter is he said there is no way a person of ordinary skill in the art would equate these two under any circumstances. Okay? He disagreed completely with Heine. And now I'm still, forgive me for doing it, the Supreme Court said when you have all of these elements in front of you, you have the patent saying there's three different functions or ways, whatever you're talking about, where it's clear that we do not have them, and there's good reason for not having them, all right? Then every once in a while you have to forget that it's fact, and judges have to use common sense. That was what KSR was. Stop issuing patents that anyone can see can't possibly meet those requirements. They didn't respond, I think, because they couldn't respond. Their patent, the very patent that we're talking about, digs a hole for them on those other requirements, and the judge found that those other requirements were necessary for the patent. They didn't appeal the finding of no infringement by direct means. They did this equivalence, and then we set out that the patent shows it can't possibly be equivalent. Gilles says very positively, a guy with 30 years' experience, 20 years in this art, says that these are so bizarre they're not even close, and forgive me, that's why I go to KSR. The Supreme Court has announced very clearly that common sense doesn't leave the district court judge, and I think at a certain point you say the judge, even on a motion for summary judgment, can apply simple common sense. Can I interrupt you for just a moment with a factual question? Turning to the portion of the Joint Appendix that we were discussing before with Mr. Heisenberg, where in your opening brief on summary judgment to the magistrate judge, where are the beginnings and the ends of what you submit for your discussion of the doctrine of equivalence issue? So that we know exactly what was in play when the document was presented. So starting on 2134, and forgive me, it keeps going, it goes very many pages. With drawings, highly detailed drawings. I'm talking about equivalence. Not that. Only equivalence. 2136. So it goes 2134 through 36. Yes. Starting on 2123, the last paragraph. 2123 or 2133? I am sorry. Include 2123. 23 or 33? No, I'm going to start with 2123 because the last paragraph starts talking about the doctrine of equivalence. That's it. But in terms of the need of your argument as to why there is no equivalence, that we would find between 2134 and 2136. That's where you lay out the three functions. Yes, Your Honor. The second full paragraph down on 2134. Right, okay. And if you read Gilleste's affidavit, you will see that he doesn't use the term, but that the argument that they're equivalent is bizarre. Counsel, one question I have for you, which is all of these briefs in the entire appendices, there's a lot of confidential marking. You know, it might all say confidential. Is any of this deemed confidential? When we write an opinion, are we allowed to get into this, or is this something the parties deemed confidential? Well, I'm going to take a risk right now. It is not confidential. I think you're, Mr. McCandless. Just to point out that under the court's rules, we did file a version of the joint appendix that identified, by highlighting, I believe, portions that were confidential. Right. But the problem is we frequently find that we need to allude to materials that are marked as confidential, but in fact the parties don't really continue to regard them as such. And on behalf of my client, I waive it as to what I've just pointed out to you. Does Mr. Heiss have the same view as to that matter? Your Honor, I think so. It would all involve their confidential information. All right. Well, if anyone has a different view, you can let us know by mail if you would like. Okay. I will do that. We can assume that we don't have to steer clear of some of the material that's been marked. All right, Your Honor. Is that a fair assumption? Yes. I don't know of the appendix or just the pages that you referred to. I'd have to go and compare it to the ones we went through carefully. Your colleague may have a response. It's difficult to say here. I think that there was relatively little that was identified in either the briefs or in the joint appendix as actually being confidential. And mostly it was quotations from the company's internal document. Certainly nothing discussing- Okay. All right. Mr. Moore. I have one question, which goes to the issue of jurisdiction. Counterclaim one was dismissed by the court. Is that correct? Your counterclaim one was dismissed by the court. I believe that's true, Your Honor. Now, was that dismissal ever incorporated in the final judgment in court? March 31st order. I'd have to read it carefully. She was very, very meticulous in what she was doing. She may have been meticulous, but I think in this instance she may have left something out. She may have left something out. I know that there were revisions filed with the court, motions for correction. I'd have to check that out. Well, take a look at the order of March 31. It's not included. It says that the final order in judgment does not include a dismissal of the counterclaim one. So the question remains as to whether or not counterclaim one was finally dismissed and so avoided a judgment was issued on that basis. Your Honor, at 73 years of age, I plead ignorance. I'd have to check that out. I'm sorry. Could I have a few moments to confer? If we don't have a final judgment, we have no jurisdiction over that issue. Okay. Well, doesn't an order become finalized for 150 days even in the absence of a final judgment? I would like to adopt that. If it satisfies the other two judges. Well, I obviously didn't come prepared with the background. Let me suggest this. I mean, I think Judge Nugaris is correct that there appears to be an omission from the document entitled Final Judgment of Independent Final Judgment Records. And perhaps the parties could give us some, by letter. You don't have to file supplemental briefs or anything. But just give us your thoughts as to the proper way to proceed. If, well, A, do you think that there's an omission? I think you'll find that there is. B, what consequence flows from that for purposes of our jurisdiction? And by that, I mean, is it available? Can it be cured? Does it need to be cured? You understand? I do, totally. Well, I think that that's going to handle that perhaps. I learned in law school, jurisdiction is everything. Well, and finality is important, too. It is, indeed. Jurisdiction, even if on a technical point, is important. Why don't we do that? We'll ask you this. All right. Thank you, and thank you for the extra time. No, thanks. Very well. Mr. Weiss, I promise to be here for a lot of time. Do you want to start by addressing Hanson? Your Honor, Hanson did not, in the words of a UMC case, squarely address or definitively decide the issue presented by Rexon on this appeal. The issue that they framed in their brief was whether the district court misapplied Section 287A in light of the fact that Rexon only asserted infringement of method claims. The question is one of statutory construction. The question of law. That's from their brief at page 26. Hanson did not purport to construe the statute or- Certainly it did. It referenced 287. I mean, opinions have been used, the magic words, construe the statute to amount to a construction of the statute. When it says holding, that holding can't be reconciled with what you're asking us to do in this case. It's nonetheless a construction of the statute, effectively. Your Honor, the holding in the case was, reading from page 1083, our decision is a narrow one. No, no, no. This opinion addressed far more than just marking. There's a final, conclusive paragraph, paragraph 4, which is not part of the marking section, which talks about the decision being a narrow one and says that we find none of the findings by the magistrate could be erroneous. That is not a categorization of the 287 point as a finding of that. The magistrate had ruled in that case that there was a process patent at issue. In fact, it now appears that- The court made it absolutely clear that that's not the case. In fact, it was not. There's no way you can argue that this court is saying the magistrate's finding that only process claims are issued in this patent is not clearly erroneous because the court in two different places, including the analysis described here, talks about the apparatus claims. Your Honor, I didn't read the case as construing the statute. The issue that Rexon is framing in this case is whether another exception should be written into the statute. I didn't see that as something that was squarely addressed in the Hansen case. The way they would like to construe the statute is, in the event of a failure so to mark, no damages may be recovered by the patentee in any action for infringement. They'd like to insert the words, except in those actions in which the patentee elects to assert only its method but not its apparatus claims. But we've already said in multiple occasions, as you acknowledge in your brief, that method claims don't require marking in order to be asserted. Now, what you would like us to hold in this case is if there happen to also be apparatus claims in that patent. Yes, they do. So you're actually asking us for a bit of an exception from our law. What we're asking is that if there's something, which I think has been held before in other cases, if there's something to mark, the patentee should mark. Well, in this case, there was something to mark. If it's an apparatus, if a patent has an apparatus claim, something patented, that thing is sold, the policy of the law and the statute, I would assume that in the statutory language, require that it be marked. But that would be marked again if the patent contained only method claims. If the patent contained only method claims, clearly there is nothing to mark in the statute. But you have a method claim and you have a device which is specifically designed to perform that method and can be used for no other purpose. It can only be used to perform that method. But I don't understand your position. Maybe you've got to mark that device. That's not my position. What I'm saying is if there is an apparatus claim and if there is an apparatus that's been sold, there is something to mark Well, it doesn't matter if there's an apparatus claim. If there's an apparatus that's being sold, which embodies and exclusively embodies the method that's being used, why wouldn't the logic of your position suggest you must mark that apparatus? Because the apparatus in that case is not a patented thing. Somebody should be able to pick up the thing and that should be covered by the claim. Well, can't you mark it by saying this apparatus performed the method, covered by a patent, makes legitimacy? I suppose you could mark it that way. The statute makes marking permissive. It doesn't require marking. So if you have two patents issued successively from the PTO, one on the apparatus, the other on the method, the party asserting infringement comes in only with the method patent. No marking required. That's the, I think, I forget the name of the case, it's State. I believe it's the State case. Patents are separate. Many times when there's a separate apparatus and method claim, it's because the patent office has decided that they're two separate and independent inventions. In this case, the patent office didn't hold that they were two separate and independent inventions. There's only one invention. Your Honor, if I may, the language that I should have used from, quoted from the Toro case was non-critical. It didn't use the word central, but it did use the word non-critical, and I apologize if I misspoke. I also would like the public court's attention to three pages in the appendix, 21-22, 21-32, 23-30, and actually one more, 49-50. Those are the statements of fact in the underlying briefing, the opening brief, the response briefing, and the reply briefing. What you will see is that the first time Rexham indicated that the, they felt that it was an obligation of our expert to address these additional functions was in, on page 49-50, in paragraph 10 on the reply brief. Thank you. Thank you. Technically, Mr. Andrews has an opportunity for rebuttal on the cross appeal. Would you like to say anything further? I rest my case, Your Honor. You certainly may. The court welcomes those words. Thank you. Giving back time to the court is always welcome. Thank you. I'm a former law clerk from 1962. Well, in that case, you know. I do. Thanks for answering the cases today.